IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONALD D. HOLMES, and
GINA Y. KOPP,

              Plaintiffs,

    vs.

WESTERN TITLE & ESCROW COMPANY,
a Oregon Corp., and LLOYD
& GLENDA RAGAN, husband and
wife,

              Defendants.

Case 6:09-cv-6023-AA
FINDINGS OF FACT AND
   CONCLUSIONS OF LAW

---

Donald D. Holmes
17006 N. 131st Ave.
Sun City West, Arizona 85375
    Plaintiff Pro Se

George A. Burgott
Luvaas Cobb
777 High Street, Suite 300
Eugene, Oregon 97401
    Attorney for defendants Lloyd and Glenda Ragan

AIKEN, Chief Judge:

    This case was tried to the court without a jury on December

11-12, 2012. The Court heard and reviewed the testimony of the

Page 1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

witnesses, considered the evidence of record, the credibility of the witnesses, the entire file of the Court, and the contentions and arguments of counsel.  Therefore, in accord with Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. The real property and dwelling which is the subject of this lawsuit is a 1975 Statler mobile home located at 310 NE 32nd Street, Newport, Oregon (hereafter known as "Home").

2. Defendants, Lloyd and Glenda Ragan ("defendants"), purchased the Home in August 2003 for $65,000.

3. Prior to the Ragans purchasing the Home, they found it pleasant and clean, with no signs of mold, mildew, odor, or mustiness.  Nor did they find any evidence or indication of a pest infestation, particularly mice or rats.

4. Witness and real estate realtor, Tammy Gagne, testified that the Home was listed for sale through a real estate broker and defendants purchased the Home via Ms. Gagne, acting in her professional capacity as a realtor. As the selling agent, Gagne credibly testified that she was in the Home prior to the sale and at no time did she believe this was a "problem house," nor did she recall any evidence of mold or pest issues.

5. Ms. Gagne prepared the earnest money agreement on behalf of the previous owners.  The documentation that remains from that

transaction indicates that a pest and dry rot inspection was performed and that the seller agreed to a $500 reduction in the price in lieu of performing any repairs.

6. Several years ago, plaintiffs' counsel requested a copy of the pest and dry rot report from Ms. Gagne. Ms. Gagne testified that she declined to provide a copy of the report to plaintiffs' counsel since they were not parties to the transaction, however, she did review the report and informed plaintiffs' counsel that the report did not contain any mention of significant problems with the property, including any mention of mold or pest issues.

7. Ms. Gagne further testified that $500 is an amount consistent with the cost at that time of a very minor repair. Ms. Gagne testified that the transaction would not have closed with a simple $500 reduction in price if there had been significant mold or rodent infestation issues set forth in either the inspection report or the property disclosure form.

8. Both defendants testified separately that they were never told by anyone that there were any problems with mice, rats or other rodents, nor that there was any mold in the Home, prior to purchasing the Home.

9. Mr. Ragan testified that after purchasing the Home, he proceeded to improve it by, among other things, installing sheet rock over the existing paneling. Mr. Ragan testified that this was his standard practice with a mobile home since removing the

Page 3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

existing paneling would likely damage it. Defendants testified that they were not covering up a mold or rodent problem by installation of the drywall.

10. Joseph Lupo, a contractor, testified that it is a standard practice in the industry to install dry wall over existing paneling.

11. The defendants lived in the Home for the next four summers, traveling back and forth between Oregon and California. Defendants both testified that they never observed any mold or pests during that time. The House did experience a roof leak where the main house intersects with an addition constructed by the prior owners. The leakage was stopped, the damage to the drywall repaired, and the wall was repainted. This leakage was disclosed to plaintiffs prior to the time plaintiffs agreed to purchase the Home.

12. There is a crawl space underneath the Home.  Defendants testified that they have never crawled underneath the Home.  Mr. Ragan testified that in the summer of 2007, a employee of either the local electrical utility or the City of Newport crawled into the crawl space under the Home and worked for several hours as part of a free program to improve energy efficiency by sealing open spaces.  Mr. Ragan testified that the worker never commented or indicated that there might be rodents or pests underneath the Home.

Page 4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

13. Sometime in 2007, defendants decided to sell their Home. They placed a "For Sale" sign in the front of the home.

14. Plaintiffs and defendants testified that defendants first met plaintiffs when they stopped by unannounced after seeing the "For Sale" sign. Plaintiffs stayed between two and four hours with Mr. Holmes conversing with Mr. Ragan, and Ms. Kopp conversing with Ms. Ragan.

15. During that visit, Mr. Holmes toured the Home. Mr. Ragan testified that throughout that detailed tour, Mr. Holmes never asked any questions or made any comments about mold, mildew or mustiness.

16. Mr. Ragan and Mr. Holmes went outside during this visit and used a flashlight to look into the crawl space. Neither individual actually went into the crawl space. Mr. Holmes observed with his flashlight a piece of old, rusted, metal equipment of unspecified nature. Mr. Ragan had not placed it there, nor could he identify it. Mr. Ragan told Mr. Holmes that he had "no idea what it is," but suggested it might be some sort of high frequency device to keep rodents out from underneath a house. Mr. Holmes did not inquire further, nor did he inquire at a later time about the equipment.

17. Mr. Ragan and Mr. Holmes agree that they briefly discussed the terms under which defendants were offering the Home for sale. Mr. Ragan stated they were asking $160,000, but indicated they

would take $150,000 if plaintiffs paid all closing costs and paid
for the inspection. Mr. Holmes responded, "well, I don't need an
inspection."

18. Plaintiffs returned to the Home approximately ten days later
and agreed to purchase the Home for $150,000, without any further
negotiations. Since neither plaintiffs nor defendants were
represented by a realtor, Mr. Ragan suggested they go to a title
company. There is some dispute about how the title company was
selected, although ultimately, they went to the title company in
town, Western Title and Escrow Company ("Western").

19. On September 27, 2007, plaintiffs and defendants entered into
an Owner's Sale Agreement and Earnest Money Receipt ("Sale
Agreement"). The form of the Sale Agreement was provided by
Western, and the parties completed the form at Western's office
in Newport City, Oregon.

20. Mr. Holmes had previously graduated from law school and
practiced law for eight years as an Associate with a mergers and
acquisitions law firm.  He is a member of two state Bars. Mr.
Holmes wrote the necessary handwritten entries into the Sales
Agreement, and was also the person who checked off sections that
were applicable where there was a choice offered on the form.

21. Mr. Holmes informed Mr. Ragan that plaintiffs did not need
any property inspections, which would have been performed at
plaintiffs' expense under the terms of their agreement. Mr.

Holmes checked the box indicating that he was satisfied with the property and left the "Professional Inspection" box unchecked.

22. Mr. Holmes and Mr. Ragan then signed the Sale Agreement, initialing all of the elections and handwritten entries.

23. The Sale Agreement provided for a choice regarding inspections of the property: either a "Professional Inspection," or a "Purchaser's Inspection," which stated, "Purchaser has personally inspected the property and all elements and systems thereof. Purchaser is fully satisfied and has elected NOT to have an inspection performed by anyone else." Mr. Holmes checked the box indicating: "Purchaser's Inspection."

24. Pursuant to the Sale Agreement, plaintiffs paid defendants $1000 in earnest money on September 27, 2007. Under the terms of the Sale Agreement, additional earnest money in the amount of $9000 was due on or before October 2, 2007, and was paid by plaintiffs. The Sale Agreement provided that the transaction closing was scheduled for January 2008.

25. In December 2007, Mr. Holmes contacted Mr. Ragan to ask if he could drop off some of his belongings prior to the scheduled closing. Mr. Ragan consented.

26. Mr. Holmes then telephoned Mr. Ragan to report that a big storm had come through the area and caused damage to the Home's roof which resulted in water coming into the Home. Defendants were living in California at that time and were unaware of the

storm or the damage to the Home.

27. Mr. Ragan testified that he immediately offered to cancel the sale and to return the down payment paid by plaintiffs. Mr. Ragan testified that Mr. Holmes refused and insisted that he wanted the Home and didn't want out of the deal.  Mr. Holmes suggested to Mr. Ragan that he should submit a claim to their insurance company so that the storm damage could be repaired without expense to either of them.

28. During that conversation, Mr. Ragan testified that he offered to hold back $8000 from the sale proceeds at closing to ensure that the roof damage would be repaired. Mr. Ragan testified that if was clearly understood by Mr. Holmes that plaintiffs, as purchasers, would be entitled to the funds being held in escrow only if they incurred expenses for the roof repair.

29. Mr. Ragan called his insurance carrier, Foremost Insurance Company ("Foremost") and submitted a claim for the storm damage to the Home's roof.  At this time, defendants were living in California. Mr. Ragan testified that it was his understanding that plaintiffs would take possession of the Home, stay in the Newport, Oregon area, and direct all repairs to their satisfaction once the claim was submitted to Foremost.

30. Mr. Ragan then signed paperwork submitted to him by Joseph Lupo who was supervising the repairs for the contractor, Ron Pruett Construction. Mr. Ragan understood that he had signed all

necessary paperwork to authorize Mr. Holmes to be the inspector and the person to approve or reject all work that was being done under this claim.

31. Sometime later, Mr. Ragan received a proposed escrow agreement related to the $8000 holdback he had earlier discussed with Mr. Holmes. The agreement referenced a 60-day time frame within which all roof repairs must be completed. Mr. Ragan phoned Mr. Holmes and stated he never agreed to a 60-day time frame given that construction work on the coast is "notoriously slow." Mr. Ragan testified that Mr. Holmes responded that he "didn't need to worry about that" and confirmed that plaintiffs would not hold defendants to any deadline for completion of the roof repairs.

32. In January 2008, Mr. Holmes phoned Mr. Ragan to report that the repair was more extensive than the roof repair.  Mr. Ragan testified that he again offered to cancel the sale and Mr. Holmes once again refused and indicated to him that "we want the house." Mr. Ragan reported that they agreed to proceed with closing on January 15, 2008, with the additional repairs to the Home to be completed at the expense of Foremost Insurance Company.

33. Defendants subsequently received various closing documents prepared by Western and signed by plaintiffs including instructions for the eventual disbursement of the $8000. The Buyers Closing/Escrow Instructions specifically held:

Page 9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

"1)...approximately $8000 or less (balance of Buyers tendered process) shall be held in Escrow by Western Title pending resolution of roof leak and water issues between Sellers and Buyers;...6) Western Title shall hold balance of Buyer proceeds, approximately $8000 or less, pending release upon a distribution agreement prepared and signed by Sellers and Buyers."

34. Mr. Ragan testified that it was defendants' understanding that these instructions were confirming what Mr. Holmes had personally assured Mr. Ragan when they spoke with regard to elimination of any 60-day deadline. That is, the $8000 held back from the purchase price would be paid to defendants upon successful completion of the roof repairs which were going to be paid for by the insurance company, without any time limit for doing so.

35. After all wet and damaged materials were removed from the Home, the contractor, at the sole expense of Foremost Insurance, brought in Kathy Ellis from Wise Steps, a Safety and Industrial Hygiene Consulting Firm, to assess complaints of mold in the house. Kathy Ellis prepared a remediation plan for the Home and later certified that Pruett construction followed the protocols as set forth in her plan.

36. Kathy Ellis testified that she did detect some mold in the Home, but it was the type of mold that was expected to develop after water intrusion into a house. Based on sample testing

Page 10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

conducted by Ellis, she found no elevated mold levels in the Home. In fact, Ellis testified that the ambient mold levels were actually higher outside the Home than in the Home itself. Further, Ellis testified that the air samples taken both inside and outside the Home were consistent and did not indicate a higher level of mold inside the Home.

37. Joseph Lupo, the foreman for Pruett Construction who supervised the remediation work, is qualified as a mold remediation expert.  Lupo testified that any mold that was found at the time of the 2008 repairs was caused by the storm damage and resulting water intrusion in December 2007.

38. While accessing the areas of significant water accumulation due to the storm, Lupo found the carcasses of 47 dead field rats in the crawlspace insulation between the belly wrap and the subfloor. Lupo testified that the carcasses were "old," but he did not know how old.

39. No live rodents were found in that location, or in any other location of the Home. Nor were any carcasses found anywhere other than in the crawlspace insulation.

40. In the remediation performed by Lupo and Ron Pruett Construction, all of the carcasses were removed and the belly wrap, insulation and ground cover were replaced with new materials. The entire area was then disinfected including the crawlspace from the gravel base up to and including the floor

joists using appropriate antimicrobial products.

41. Kathy Wise testified that this remediation work met the standard accepted practices for dealing with the presence of rodents.

42. Foremost Insurance ultimately paid over $40,000 to completely rebuild substantial portions of the Home due to the storm damage. That work was completed in the same general time frame as the defendants return to Oregon. After the work was completed, Mr. Lupo testified that the Home was in better condition post remediation than at the time plaintiffs agreed to buy it.

43. Specifically, the evidence shows that after the insurance company funded repairs, the Home had a new roof with a new warranty, a new ceiling and crawlspace insulation, a new belly band and ground cover were installed, and the home was fully repaired.  Kathy Ellis testified that she certified the remediation of the mold and rodent issues and those issues were, in fact, fully remediated according to industry standards.

44. On or around March 14, 2008, plaintiffs vacated the Home. On or around March 28, 2008, plaintiffs' attorney mailed a letter to defendants stating that plaintiffs were tendering the Home back to defendants and demanding return of the purchase price. Defendants refused plaintiffs' tender and refused to return the purchase price.

Page 12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONCLUSIONS OF LAW**

1. Plaintiffs' Claim One is for "Intentional Misrepresentation." Under Oregon law, each element of fraud must be proved by clear and convincing evidence.  Oregon Public Employees' Retirement Bd. v. Simat, Helliesen & Eichner, 191 Or. App. 408, 423-24, 83 P.3d 350 (2004).  Further, the "truth of the facts asserted must be highly probable." Riley Hill General Contractor, Inc. v. Tandy Corp., 303 Or 390, 407-08, 737 P.2d 595 (1987). The Court finds that plaintiffs failed to meet this standard, and therefore the claim fails. Defendants did not have actual knowledge at the time of the Sale Agreement that the Home had rats or mold. The mold found after the storm/water damage was not in existence at the time of the Sale Agreement. Finally, plaintiffs did not rely upon any statements of defendants regarding mold or rats when purchasing the Home.

2. Plaintiffs' Claim Two for "Breach of Contract" contains various theories of recovery. Regarding plaintiffs' contention that defendants breached an actual provision of the Sale Agreement, the contract requires "actual knowledge of any material defects in the structure, utility systems or other element of the property." The only claimed knowledge by defendants is that "the Home had rodents." The court finds that plaintiffs had no knowledge of any dead rodents under the Home at the time of the Sale Agreement.

2A. Plaintiffs also claim that defendants' failure to disclose a known material defect breaches an implied covenant of good faith and fair dealing. Oregon law holds that the duty of good faith cannot serve to contradict an express term of the written contract. Uptown Heights Assoc. Ltd. v. Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639 (1995). Where, as here, a contract standard is created, the Court will not find that an implied covenant of good faith and fair dealing creates a new standard.

2B. Contrary to plaintiffs' argument, the Court finds no agreement between the parties to amend the Sale Agreement to require the repairs undertaken by the insurance carrier to be completed within sixty days. Since the Court finds no such amendment in writing, any alleged oral agreement violates Oregon's Statute of Frauds.  Or. Rev. Stat. 41.850.

2C. Defendants have asserted the defenses of estoppel and waiver by plaintiffs. Estoppel by silence is a form of equitable estoppel where the individual's failure to speak when he or she has a duty to speak may preclude that person from asserting a right that he or she otherwise may have.  Pfaendler v. Bruce, 195 Or. App. 561, 570, 98 P.3d 1146 (2004).  The Court finds that plaintiffs are estopped from asserting any time limits for the completion of any repairs based upon the evidence admitted at trial.

2D. Further, based on the testimony at trial, the Court finds

Page 14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

that plaintiffs' statement to defendants regarding the
nonenforcement of the original sixty day time period constitutes
a waiver of that alleged requirement. Waiver is an intentional
relinquishment of a known right. Waterway Terminals Co. v. P.S.
Lord Mechanical Contractors, 242 Or. 1, 27, 406 P.2d 556 (1965).
Waiver must be manifested in an unequivocal manner. Id. The
Court finds that plaintiffs' express statement to Mr. Ragan that
any time limit in the original Holdback Agreement would not be
enforced constitutes unequivocal waiver.

2E. Plaintiffs also contend breach of an implied covenant of good
faith and fair dealing when defendants were required as a
contract term to provide Mr. Holmes with a power of attorney or
assignment of the insurance claim. The Court finds based on the
evidence admitted at trial that Mr. Holmes was authorized in
writing to oversee the remediation and repair project on the
Home, and as the person on the scene, he was in charge of
determining, approving and deciding what work needed to be
accomplished.

    Oregon law holds that it is the "objectively reasonable
expectations of [the] parties that would be examined in
determining whether the obligation of good faith has been met."
Uptown Heights, 320 Or. at 645. The Court finds that the
"objectively reasonable expectations of [the] parties" does not
result in an implied covenant requiring a specific procedure for

Page 15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

the work being done by the contractor hired by the insurance company. The end result - the complete restoration and remediation of the Home - could have been reasonably achieved in various ways. It is inconsistent with Oregon law to go back and impose another procedure as an implied contract term.

Plaintiffs' breach of contract claim, including each of plaintiffs' various theories, fails.

3. Plaintiffs' Claim Three and Defendants' Counterclaim. These claims concern the $8000 that defendants originally paid into escrow to ensure that the roof on the Home would be repaired without cost to plaintiffs. Therefore, the provisions of the Holdback Agreement drafted by former defendant Western Title will be construed consistent with that stated purpose.  The Court finds that the Home's roof was fully repaired at the sole expense of the insurance carrier. The Court has previously found that any time limit for repairs to the roof was eliminated by the Buyers' Instructions and approved by defendants.  Since the roof has now been repaired, the $8000 withheld and now deposited with this Court should be returned to defendants.

3A. Plaintiffs assert a new claim based upon defendants' alleged failure to provide plaintiffs with an Or. Rev. Stat. 105.465 property disclosure statement. First, the Court finds no such claim in the Pretrial Order and therefore will not consider the claim. Second, even if the Court were to consider this claim, Or.

Rev. Stat. 105. 475 provides that any right to revoke an offer to purchase real property based upon the failure to provide a property disclosure form is terminated if the buyer closes the transaction. Here, there is no dispute that the transaction was closed prior to any attempt to revoke the transaction. Therefore, Or. Rev. Stat. 105. 465 would not serve as a basis for rescinding this transaction after closing.

3B. Plaintiffs also rely on Or. Rev. Stat. 93.290 as a basis for rescinding the transaction. First, again, since plaintiffs failed to raise this claim in the Pretrial Order, the Court will not consider it.  Second, even if the Court were to consider this claim, Statute 93.290 concerns real estate contracts that are silent on the risk of loss when the property is destroyed at a time when "neither legal title nor possession has been transferred to buyers." The agreement "shall be interpreted" as providing the parties with specified "rights and duties" that essentially provide that the buyer is not required to complete the transaction. Statue 93.290 does not act to void the real estate agreement and prevent the parties from continuing forward with the transaction.  There is no dispute that is exactly what occurred here, plaintiffs articulated their intention to proceed with the transaction several times to the defendants. Specifically, the evidence holds that plaintiffs were offered their money back twice, but declined and instead chose to proceed

to close the transaction and take possession of the Home.
Statute 93.290 does not prevent plaintiffs from doing so, nor
does it serve as a basis for rescinding the transaction after
voluntarily completing the purchase.

Plaintiffs' Third Claim fails and defendants' Counterclaim
prevails.  Therefore, the $8000 held by this Court in its
Registry should be returned to defendants.

4. Finally, any Findings of Fact which constitute Conclusions of
Law and Conclusions of Law which constitute Findings of Fact
shall be deemed to have been determined accordingly.

IT IS SO ORDERED.

Dated this /8th day of December 2012.


_____
Ann Aiken
United States District Judge